IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  06-cv-01510-WYD-BNB

AMERICAN CANINE FOUNDATION; and
FLORENCE VIANZON,

    Plaintiffs,

v.

CITY OF AURORA, COLORADO,

    Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

THIS MATTER came before the Court on a bench trial held the week of November 17, 2008.  The trial concluded on November 19, 2009.  I found in favor of the Defendant and against Plaintiffs as discussed in the record on November 19, 2008.  Defendant then submitted proposed findings of fact and conclusions of law.

After considering the testimony of the witnesses, the credibility of the witnesses, the exhibits submitted, the arguments of counsel, and Defendant's proposed findings of fact and conclusions of law, I now enter the following Findings of Fact and Conclusions of Law.

I.    <u>FINDINGS OF FACT</u>

1.    The City of Aurora, Colorado is a home rule city.

2.    On October 24, 2005, the Aurora City Council adopted Aurora City Code Section 14-75, hereinafter referred to as the "ordinance", which forms the subject of this action.  The ordinance went into effect on November 26, 2005.

3. The ordinance regulates the possession of specific breeds of dogs within the city limits of Aurora, Colorado. These breeds include pit bulls, american bulldogs (old country bulldogs), dogo argentino, canary dog (canary island dog, presa canario, perro de preso canario), presa mallorquin (pero de presa mallorquin, ca de bou), tosa inu (tosa fighting dog, Japanese fighting dog, Japanese mastiff), cane corso (cane di macellaio, Sicilian branchiero), fila brasileiro or any dog displaying the majority of physical traits of any one (1) or more of the above breeds. According to Cheryl Conway, public relations specialist for the City of Aurora animal control division, three of these breeds are breeds banned in most of the cities abutting Aurora's borders. The other breeds were breeds that the animal control officers in the field told management that they had concerns about and asked to be addressed in the ordinance.

4. Pursuant to the Aurora Colorado Charter, the City of Aurora has all powers which are necessary, requisite, or proper for the government and administration of its local and municipal matters, and all powers which are granted to home rule cities by the Constitution of the State of Colorado.

5. As testified by Cheryl Conway, pursuant to the Aurora City Charter, Section 3-9, the Aurora City Council has all legislative powers of the City and all other powers of home rule cities not specifically limited by the constitution of the State of Colorado and not specifically limited or conferred upon others by the Aurora charter. The Aurora City Council has, among other powers, the power to enact and provide for the enforcement of all ordinances necessary to protect life, health and property.

6. One of the plaintiffs in this matter is Florence Vianzon. Ms. Vianzon owns a dog which is a half Staffordshire terrier mix (half pit bull). Under the grandfather clause of

the ordinance at issue in this case, Ms. Vianzon was able to maintain ownership of her dog by taking certain actions required by the ordinance.

7. The other plaintiff is the American Canine Foundation, which is an organization based out of the state of Washington. Mr. Glen Bui, a representative of the organization, attended the trial and testified on multiple occasions in this trial. Mr. Bui testified that American Canine Foundation is a non-profit, charitable corporation that advocates for responsible dog ownership.

8. At trial, Cheryl Conway testified that the Aurora City Council initially considered breed specific legislation in 2003. During that time frame, Aurora was the recipient of a number of dogs banned in other cities close to and/or bordering Aurora, and Aurora's animal control officers were voicing concern about the increasing numbers of these animals and their aggressiveness. Further, a concern was noted that breeding was a lucrative business in Aurora, and that these banned dogs were being bred increasingly for their aggressive tendencies. Finally, Aurora was receiving calls from constituents complaining that they were afraid of these dogs.

9. Rather than enact a breed-specific law at that time, the Aurora City Council opted instead to strengthen its dangerous and vicious animal ordinance. It did so by requiring certain animals to be spayed and neutered and increasing the penalties under that ordinance. The City also started a campaign to educate the public regarding these changes in the dangerous and vicious animal ordinance. Ms. Conway testified that this attempt to strengthen the dangerous and vicious animal ordinance fell short of its goal, as the number of reported bites continued to rise, the request for services from people

related to dangerous and vicious animals increased, and the numbers of these dogs in shelters continued to increase.

10. In 2004 House Bill 1279 was enacted into a state law which prohibited cities from enacting breed specific legislation. The City and County of Denver, like the City of Aurora, is a home rule city. In 2005 Denver challenged that state law as it relates to home rule cities and prevailed in that litigation. The City of Aurora decided to await the outcome of that litigation before enacting the breed specific ordinance which is the subject matter of this case. While awaiting the outcome of that litigation, there was evidence at trial that incidents involving restricted breeds were continuing to occur inside and outside of Aurora.

11. After Denver prevailed in the litigation, the Aurora Code Committee held a number of policy meetings which were open to the public as well as a public hearing before the entire Aurora City Council on August 9, 2005 to consider whether restricted breed regulations would promote the health, safety and welfare of the citizens.

12. When contemplating enacting this ordinance, the Aurora City Council received input from Animal Care Officers, members of the American Canine Foundation, and members of the public who were both in favor of and opposed to the ordinance. Based on this input and data provided to the City Council, the Aurora City Council found that it was necessary to ban the ownership of pit bulls and the other restricted breeds in order to protect the health, safety and welfare of the City's residents. Specifically, the ordinance at issue noted that pit bulls tend to be stronger than other dogs, often give no warning signals before attacking, and are less willing than other dogs to retreat from an attack and that pit bull attacks, more often than other types of dogs, result in multiple

bites and attacks of greater severity. At trial the City of Aurora presented evidence that the Aurora City Council, when enacting the ordinance in question, had evidence that supported these findings as to pit bulls and the other restricted breeds.

13.     In that regard, Ms. Conway was asked what information was provided to the Aurora City Council that supported these findings. She actually testified before the code enforcement meetings regarding the enactment of the ordinance, and responded to City Council's questions, requests and directives. Ms. Conway testified that Aurora animal control provided Aurora information that supported these findings, which came from officers in the field who deal with these animals. Animal care division staff advised the Council that these dogs are stronger than other dogs, as evidenced by the fact that when in the shelters they caused substantial damage to their kennels, as explained in the next paragraph. Further, concern was expressed from animal care division staff that there was a fighting propensity among pit bulls and that they were more aggressive than other dogs.

14.     Ms. Conway also testified that information was provided by animal care division staff that the restricted breeds caused Aurora to incur costs with respect to impounding them that were different than the costs incurred with other breeds because of the damage they caused to their kennels. Aurora needed to put roofs over some of the kennels to keep dogs from these breeds from escaping, and had to replace a lot of gates. These breeds were destroying the sliding doors in the kennels, were known to take out the concrete cinder block walls, and destroyed their metal water buckets which needed to be replaced almost daily. Also as to the restricted breeds, Aurora was unable to divide a kennel in half to house two dogs instead of one as it did with other

breeds because the restricted breeds were aggressive and there was a risk that they could destroy the sliding gate in the kennel and attack the dog on the other side of the kennel. In addition, during peak season, Aurora had to buy metal covers for the gates so that the restricted breeds could not see the kennel across the aisle from them. The dogs would destroy the gates if they could see a dog across from them, so that they could get to that other animal.

15. In addition, Ms. Conway testified that Aurora lost revenue from adoptions. At any given point in time, over a three year period, there was a highly disproportionate number of restricted breeds in the kennels as compared to all other breeds of dogs combined. Because these breeds had to be housed until they went through the court process, Aurora had to move adoptable dogs out of the kennels. Further, because these breeds needed to be kept in the kennel for an extended period of time for them to go through the court process, Aurora's medical costs for those animals were increased.

16. Ms. Conway testified that the City Council also heard testimony at public hearings and from citizens at the code committee meetings and the full City Council meetings about the behavior of these dogs and that they are stronger than other dogs. The City Council watched a video at the code committee meeting which showed that pit bulls often do not give warning signals before an attack. The video showed restricted dogs attacking other dogs and showed a restricted dog attacking an animal control officer. Further, animal control staff provided information that the signals are different than other dogs. Most dogs will growl or bark as a warning, pit bulls do not. In fact, pit bulls can be wagging their tails and instantly go into an attack. Ms. Conway testified that a person appeared at a code committee meeting and advised City Council that his

cocker spaniel was attacked by a pit bull that pulled the jaw completely off his dog. He presented photos of the injuries of his dog.

17.     Further, Ms. Conway testified that information was provided to the City Council with respect to insurance companies. The requirements included in the grandfather clause of the ordinance were that people owning restricted breeds have $100,000 liability insurance. Counsel members heard from constituents that they were not able to obtain this liability insurance because insurance companies refused to ensure these dogs because of their dangerous and aggressive nature. Ms. Conway testified that City Council had tons of information coming from animal care, research that council members were doing on their own about these breeds, and information from constituents that supported their findings, including several bite incident reports.

18.     Finally, Ms. Conway testified that the purpose of the passing of the ordinance at issue was for Aurora to take proactive action because the other ordinance with respect to dangerous and vicious dogs was not protecting the citizens of Aurora. She said that the City Council consistently tries to be proactive, especially where public safety is concerned.

19.     Testimony of Ms. Grable, an Aurora animal care officer, supported the Aurora City Council's conclusions on several accounts. She testified that the number of bites from pit bulls started increasing significantly in 2000, and that bites from restricted breeds were more severe than other breeds. She also testified that she agreed with City Council's findings that pit bulls and other bully breeds (such as those included in the ordinance as restricted) are stronger than other dogs, as shown by the fact that such breeds have chewed through chain metal links to get out in Aurora's kennels.

Aurora has had to implement a number of remedial measures to keep these dogs safe. She testified that a pit bull also pulled another dog through the drain hole of the kennel and killed it, and she encountered a pit bull that had to be shot multiple times by officers in order to subdue it.

20.     Further, Ms. Grable testified that pit bulls do not typically give warnings before they attack, unlike other breeds.  In that regard, she testified about an incident where she was bitten on her leg from a pit bull after being invited into the owner's home.  The pit bull did not give any indicators that he was going to bite her.  She still has scarring from that bite.  Her visit to that owner's home was made because the pit bull had been loose in the neighborhood earlier and had knocked down and scratched a child. Ms. Grable testified that when pit bulls or other bully breeds, including the cane corso (another restricted breed), are involved in an incident she is more cautious when responding than normal.  Cane corsos are bred for bull baiting and if encountered in the field, Ms. Grable testified that animal control officers know that they will have to do battle with the dog.

21.     Ms. Grable also testified about an incident involving two pit bulls named Smoky and Coal.  Those two pit bulls were fighting when Aurora animal care officers responded to a call and impounded the dogs.  The dogs were so strong that they were able to escape from the kennel's cages.  Once they escaped, they fought in the middle of the kennel and it took several people to disengage the dogs and get them properly secured. These dogs were eventually euthanized.

22.     Ms. Grable also testified about an incident in which two pit bulls had a family trapped in their home.  After these pit bulls were killed, she examined them and found

-8-

no evidence of scars indicative of fighting. Nonetheless, these dogs had apparently broken from chains as there was broken metal attached to the dogs. When Ms. Grable arrived at the home where the family was trapped by the pit bulls, one of the dogs leapt at her truck from a distance of approximately six (6) feet and violently threw itself against the driver's side window. In an attempt to corral the dogs in order to prevent them from terrorizing the neighborhood, Ms. Grable was forced to hit the dog with her truck. She estimated her speed at the time of impact to be at least 20 miles per hour. Even after being struck by the truck, the pit bull did not slow down or show any signs of injury. Eventually the police arrived and were forced to shoot and kill the pit bulls.

23.     Ms. Merkle, field supervisor at the Aurora animal care division, also provided testimony that supported City Council's findings as to the ordinance. She testified that a pit bull can damage someone more than other breeds, as they have stronger bites and do not usually show when they are about to attack. The injuries caused by pit bulls are more significant than other breeds. As examples, Ms. Merkle testified that a little boy lost his arm because he was attacked by a pit bull in his back yard, and that a two-year-old boy was disemboweled by a pit bull. She also testified from her experience that restricted breeds also will fight, will sometimes chew through their plastic pallets, and that they have chewed through the slider door in the kennels or jumped over the fences of the kennels to get to other dogs. Her experience is that animal control does not have the same problems with other breeds of dogs.

II.     CONCLUSIONS OF LAW

1.     The court has jurisdiction of the subject matter and the parties under 28 U.S.C. § 1343 because the case involves claims brought to enforce rights under the United

States Constitution.

2. On May 28, 2008, I issued an Order ruling on Defendant's motion for summary judgment. The motion for summary judgment was granted as to the first claim (vagueness and overbreadth), second claim (commerce and freedom of contract), fourth claim (separation of powers) and the procedural due process claim in the fifth claim. The motion for summary judgment was denied as to the third claim (substantive due process and equal protection) and the takings claim contained in the fifth claim. The substantive due process, equal protection and takings claims all relate to Plaintiffs' argument that the ordinance at issue is not rationally related to a legitimate government purpose. Summary judgment was denied with respect to the aforementioned claims on the grounds that no evidence had been presented that the City of Aurora legitimately exercised its police power to curtail a menace to the public health and safety. Specifically, I found that no evidence had been presented that the classification of pit bulls or other breeds at issue in the ordinance had a rational basis in fact, *i.e.*, that the breeds are dangerous animals and that the prohibition of their possession bears a rational relationship to the legitimate governmental objective of protecting the public's health, safety and welfare.

3. The question for the Court now is whether there is a rational basis for this breed ban. After listening to all of the evidence presented, I conclude that there is.

4. In Colorado, dogs are accorded qualified property status, *Thiele v. City & County of Denver*, 312 P.2d 786, 789 (1957), and are thus subject to the proper exercise of police power for the protection of the public's health, safety, and welfare. *Colorado Dog*

*Fanciers, Inc. v. City and County of Denver*, 820 P.2d 644, 653 (Colo. 1991) (citing *Stone v. Mississippi*, 101 U.S. 814, 818 (1879)).

5.     Ownership of a dog does not implicate any fundamental constitutional right. *Colorado Dog Fanciers*, 820 P.2d at 651.  Thus, as noted in the summary judgment Order, in order to withstand scrutiny under the Fifth and Fourteenth Amendments to the United States Constitution, the ordinance at issue must bear a rational relationship to a legitimate legislative goal or purpose.  *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124 (1978); *Colorado Dog Fanciers*, 820 P.2d at 652.  "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).

6.     In this case, I found in the summary judgment Order and now affirm that it is undisputed that the City of Aurora stated a legitimate purpose in enacting the ordinance at issue—-the protection of health and safety of the public.  Thus, I must determine whether the ordinance bears a rational relationship to that purpose.

7.     The Plaintiffs bear the burden of proof to show beyond a reasonable doubt that there is no rational basis to classify pit bulls or the other restricted breeds at issue and that the prohibition of their possession bears a rational relationship to the legitimate governmental objective of protecting the public's health.  The ordinance comes to the Court "bearing a strong presumption of validity."  *Beach Communications*, 508 U.S. at 315; *see also Colorado Dog Fanciers*, 820 P.2d at 647 (Colo. 1991).  The Supreme Court noted in an equal protection case that "those attacking the rationality of the

legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Id.* (quotation omitted); *see also Vance v. Bradley*, 440 U.S. 93, 111 (1979) ("those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker").

8.     Moreover, the court does not require a legislature to articulate its reasons for enacting a statute, and "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id*. Thus, equal protection "does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn,* 505 U.S. 1, 15 (1992). "In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications*, 508 U.S. at 315; *see also Exxon Corp.*, 437 U.S. at 124 ("the Due Process Clause does not empower the judiciary 'to sit as a superlegislature to weigh the wisdom of the legislation. . . .'") (quotation and internal quotation marks omitted). "'Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.'" *Id.* (quotations and internal quotation marks omitted).

9.     In this case, I find that ample evidence exists to establish a rational relationship between the City's ordinance regulating the possession of pit bulls and other restricted breeds and the City's undisputed legitimate interest in protecting the health and safety of the City's residents. Specifically, evidence was presented to support Aurora's

findings that pit bulls, as well as other restricted breeds, tend to be stronger than other dog breeds, that they often give no warning signals before attacking and are less willing than other dogs to retreat from an attack and that attacks from such breeds result in multiple bites and attacks of greater severity than other dogs.  This evidence was primarily demonstrated through the testimony of Cheryl Conway, public relations specialist for the City of Aurora animal control division, as described in paragraphs 13 through 18 of the Findings of Fact.  Her testimony about the evidence presented to the City Council from Aurora animal care and others supports Aurora's findings described above and also supports a finding that the restricted breeds are more aggressive than other animals.  Evidence from Ms. Grable and Ms. Merkle as described in paragraphs 19 through 23 of the Findings of Fact also supports Aurora's findings.

10.     In so finding, I note that I am not called upon to conduct factfinding regarding the wisdom of the ordinance.  Instead, I find only from the above that Aurora had plausible reasons to support the ordinance, and there is no evidence that Aurora's City Council could not reasonably have conceived these reasons to be true.  Plaintiffs did not meet their burden of showing that the ordinance is not rationally related to the legitimate purpose of protecting public safety and health.

11.     Accordingly, I find that the ordinance is not an abuse of the City's police power.  I further conclude that the classification of pit bulls and restricted breeds in Aurora's ordinance is rationally related to its undisputed legitimate interest in protecting the health and safety of its residents.  Accordingly, there has been no deprivation of due process nor has there been a violation of the Equal Protection Clause.

12.     I also find that Plaintiffs have not established a taking. As noted in *Colorado Dog Fanciers*, "[t]he United States Supreme Court has held that a state can deprive a citizen of property when such deprivation is justified as a legitimate exercise of police power." *Id*, 820 P.2d at 653. In this case, as noted above, I find that Aurora's ordinance which in some instances does grant the City the power to take a restricted breed from an owner is justified as a legitimate exercise of police power. In that regard, I find that the ordinance regarding restricted breeds had a rational basis in fact and bears a rational relationship to the legitimate governmental objective of protecting the public's health, safety, and welfare.

13.     Further, *Colorado Dog Fanciers* held that a city ordinance such as this one prohibiting the possession of a pit bull or other restricted breed does not result in a taking of private property if a dog owner may keep the dog by obtaining a license and complying with the minimum standards for keeping the dog in the city. *Id*. In this case, Plaintiff Vianzon owns a restricted breed but, according to her own testimony, is in compliance with Aurora's ordinance and has been allowed to keep her dog. Plaintiff American Canine Foundation does not own a restricted breed. Accordingly, no evidence of a taking of private property has been presented.

III.    CONCLUSION

Based upon the foregoing, I find in favor of Defendant on the remaining claims in this case of substantive due process, equal protection and takings. Accordingly, it is

ORDERED that the Clerk of Court shall enter judgment in favor of Defendant and against the Plaintiffs on the claims of substantive due process, equal protection and takings.

Dated: May 8, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge